IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PATRICK JOHN, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>MURRAY CITY, a Utah municipal<br>corporation,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00661-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Patrick John was a Paramedic/Firefighter for Defendant Murray City.  He was injured several times while working and filed workers' compensation claims.  After some of his injuries, he was placed on administrative leave or given light-duty work restrictions.  The City terminated his employment in September 2018.

John alleges the City discriminated and retaliated against him because of his disability.  He also alleges it failed to engage in a good-faith interactive process and provide sufficient accommodations.  The City argues John was fired for cause after he performed poorly and ignored disciplinary measures.

Before the court is the City's Motion for Summary Judgment.[1]  It seeks summary judgment on all John's claims.[2]  For the reasons explained below, the Motion is GRANTED IN PART and DENIED IN PART.

---

[1] *Defendant's Motion for Summary Judgment* (Dkt. 27).

[2] *Id.* at 6.

1

# BACKGROUND[3]

John began working for the City on August 21, 2006.[4]  Throughout his employment, he was a "Paramedic/Firefighter."[5]  When John was hired, the official job description listed the "essential functions" that employees must be able "to successfully perform."[6]  Among other things, the description stated an employee "must be able to move objects between 20-50 pounds short distances (20 feet or more), perform duties requiring pulling of 40 pounds or more . . . , as well as frequently lift objects weighing 50 to 100 lbs."[7]  The description also stated, "Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions."[8]

**John Injures His Back**

In November 2006, John injured his back while working and was diagnosed with a "triple disk herniation."[9]  He filed a workers' compensation claim for this injury.[10]  On December 4, 2006, he was examined by a doctor and "released to work on a modified basis."[11]  John was

---

[3] Unless otherwise stated, the following facts are material and not genuinely in dispute.  They are drawn from the parties' summary judgment briefing and attached exhibits.  *See generally* Fed. R. Civ. P. 56(c).  Because this Order resolves a motion for summary judgment, the court "consider[s] the evidence in the light most favorable to the non-moving party."  *Duvall v. Georgia-Pac. Consumer Prods., L.P.*, 607 F.3d 1255, 1259 (10th Cir. 2010) (quotation simplified).

[4] Dkt. 27 ¶ 1.

[5] *Id.*

[6] Relying on John's deposition testimony, the parties disagree about the "essential functions" of the job.  *See* Dkt. 27 at 7; *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* (Dkt. 33) at 5–6; *Reply Memorandum in Support of Defendant's Motion for Summary Judgment* (Dkt. 41) at 2.  But both parties included a copy of the official job description in their summary judgment exhibits.  *See Ex. B to Motion: Job Description for Paramedic/Firefighters* (Dkt. 27-1 at 93–98) [*Job Description*]; *see also Ex. 2 to Opposition: Job Description* (Dkt. 33-1 at 117–22).  Therefore, the court cites the description itself, making it unnecessary to resolve the parties' disagreement.

[7] *Job Description* at 97.

[8] *Id.*

[9] Dkt. 27 ¶ 3.

[10] *Id.* ¶ 4.

[11] Dkt. 33 at 6; *see also Ex. 3 to Opposition: Return to Work Summary for Patrick John* (Dkt. 33-1 at 128).

allowed to take paid time off and required to call in sick while recovering.[12]  On December 12, he was cleared for full-duty work with no restrictions.[13]

In December 2007, John injured his back while exercising.[14]  And on April 4, 2016, he reaggravated his November 2006 injury.[15]  John filed workers' compensation claims for both these injuries.[16]

When John reaggravated his back injury in April 2016, he was placed on light-duty work restriction by his health care provider, Physician Assistant Stephen Clements.[17]  The parties dispute whether the City sufficiently accommodated John's light-duty restriction.[18]  The City asserts John was given accommodations when he requested them,[19] pointing to John's testimony that accommodations were provided "[f]rom time to time."[20]  But John argues there is no record evidence that he was accommodated following the April 2016 injury.[21]  In support, John relies on testimony from Jon Harris—Deputy Chief of the Murray City Fire Department in April 2016[22]—stating he knew John "was in pain at work" but could not recall making accommodations for him.[23]

---

[12] Dkt. 33 at 6; Dkt. 41 at 2.  The parties disagree about whether John was given time off, but they agree he was allowed to take paid time off and required to call in sick.  *See* Dkt. 27 ¶ 3; Dkt. 33 at 6; Dkt. 41 at 2.

[13] Dkt. 33 at 6.

[14] Dkt. 27 ¶ 4.

[15] *Id.*

[16] *Id.*

[17] *Id.* ¶ 6.

[18] *Id.*; Dkt. 33 at 6–7.

[19] Dkt. 27 ¶ 6; Dkt. 41 at 2.

[20] *See* Dkt. 41 at 2; *Ex. 1 to Opposition: Patrick John Deposition* (Dkt. 33-1 at 3–116) [*John Depo.*] at 31:19–21.

[21] Dkt. 33 at 6–7.

[22] *Ex. 5 to Opposition: Jon Harris Deposition* (Dkt. 33-1 at 131–226) [*Harris Depo.*] at 31:5–18.

[23] Dkt. 33 at 6–7 (quoting *Harris Depo.* at 72:1–4, 73:15–21).

After reviewing the cited testimony and record evidence, the court concludes there is a material dispute about whether the City accommodated John after his April 2016 injury.  John's testimony that "light duty accommodations" were provided "[f]rom time to time"[24] is too vague to establish he was accommodated after the April 2016 injury.  Likewise, Harris's testimony was in response to general questions about accommodations provided throughout John's employment.[25]  This ambiguity shows a dispute of material fact about whether the City accommodated John after his April 2016 injury.

**John Requests Reassignment**

As explained, Clements placed John on light-duty work restriction after his April 2016 injury.[26]  On May 31, 2016, Clements released John to full-duty work.[27]  But by John's next visit in August 2016, his pain was not improving, and Clements recommended John stop being a Paramedic/Firefighter and do "something that is not as physically demanding."[28]

On August 24, 2016, John's supervisor gave him a written reprimand for inadequate medical documentation.[29]  John's supervisor testified a hospital nurse called him and complained that John's documentation lacked consistency and accuracy.[30]  This was the first time the supervisor had given a written reprimand to an employee,[31] but it was also the first time he had received a complaint directly from the hospital.[32]

---

[24] *See John Depo.* at 31:2–21.

[25] *See Harris Depo.* at 70:20–73:21.

[26] Dkt. 27 ¶ 6.

[27] Dkt. 27 ¶ 7.

[28] *Id.* ¶ 8; *Ex. E to Motion: Stephen Clements Deposition* (Dkt. 27-1 at 133–54) [*Clements Depo.*] at 24:4–26:18.

[29] Dkt. 27 ¶¶ 33–34; *Ex. AA to Motion: Aug. 2016 Written Reprimand* (Dkt. 27-1 at 283).

[30] *Ex. Z to Motion: Mike Dykman Deposition* (Dkt. 27-1 at 270–283) at 21:4–24:11 [*Dykman Depo.*].

[31] *Id.* at 26:19–25.

[32] *Id.* at 76:14–19.

In September 2016, John told his supervisors he did not think he could continue working as a Paramedic/Firefighter and planned to "seek a disability retirement."[33]  On September 22, Gil Rodriguez—Chief of the Murray City Fire Department at the time—sent John an email placing him on "administrative leave with pay" based on concerns about whether John could "perform the essential functions of [his] job."[34]  John met with Rodriguez and the City's human resources director on September 29 and expressed interest in being reassigned to a new role, possibly as an "engineer, driver/operator, over in the fire office, or anywhere in the city."[35]

John recalled that after October 5, 2016, there were openings for "driver/operator or engineer" and openings "in the fire prevention office."[36]  Rodriguez, however, thought only the fire prevention position would be "less strenuous," and that position required an education, "which would take time."[37]  But Rodriguez admitted he "never even considered whether or not [he] could assign [John] to drive the ambulance."[38]

**John's Functional Capacity Assessment**

On October 11 and 12, 2016, and while still on administrative leave, John took a functional capacity assessment (FCE).[39]  The purpose of the FCE was "to determine his current level of work activities and to measure the consistency of his efforts."[40]  During the FCE,

---

[33] Dkt. 27 ¶ 9.

[34] *Id.* ¶ 9; *Ex. 6 to Opposition: Sept. 22, 2016 Email* (Dkt. 33-1 at 227–28).

[35] Dkt. 33 at 7; *John Depo.* at 76:7–11.

[36] *John Depo.* at 77:8–22.

[37] *Ex. I to Motion: Gilbert Rodriguez Deposition* (Dkt. 33-1 at 229–79) [*Rodriguez Depo.*] at 78:7–82:24.

[38] *Id.* at 82:1–11.

[39] *Ex. M to Motion: Functional Capacity Assessment Report* (Dkt. 27-1 at 231–41) [*FCE Report*] at 232.

[40] *Id.*

arthritis in John's hip was exacerbated.[41]  He filed a workers' compensation claim for this injury.[42]

The physical therapist who conducted the FCE wrote a report (the FCE Report) detailing her assessment and conclusions.[43]  The FCE Report explained John had "full functional range of motion" and completed the assessment tasks but had "limited range of motion of his lumbar spine in some motions."[44]  The FCE Report concluded John "was able to meet the physical demands of his job as listed on his job description, but there [were] valid concerns about his ability to successfully complete this type of work in the future."[45]

**John Returns to Work and Tests Positive for Cocaine**

After reviewing the FCE Report and its conclusions, Rodriguez directed John to return to work on October 18, 2016.[46]  John returned that day, but the next day he tested positive for cocaine after a random drug screening.[47]

---

[41] Dkt. 27 ¶ 4; *John Depo.* at 147:15–21.

[42] Dkt. 27 ¶ 4.

[43] *See generally FCE Report*.

[44] *Id.* at 240.

[45] *Id.* at 239.  John partially disputes the City's reliance on this conclusion from the Report.  *See* Dkt. 33 at 10–11. But his dispute merely emphasizes that other medical providers acknowledged he was in pain and would benefit from accommodation.  *See id.*  Accordingly, he does not genuinely dispute the statements in the FCE Report.

[46] Dkt. 27 ¶¶ 16, 18; *see also Ex. N to Motion: Oct. 17, 2016 Letter from Gil Rodriguez to Patrick John* (Dkt. 27-1 at 242–43) (stating Rodriguez was "ending [John's] paid administrative leave" and directing John "to return to work full-duty tomorrow, October 18, 2016").

[47] Dkt. 27 ¶ 18; *Ex. 13 to Opposition: Drug Screen Results Letter* (Dkt. 33-1 at 351–52).  John attempts to dispute this fact by stating, "While John had tested positive for cocaine, it is important to note that [he] used the cocaine while on administrative leave" and that "this was the only time that he had used cocaine and has not used cocaine since."  Dkt. 33 at 12–13.  The City does not dispute these assertions, *see* Dkt. 41 at 3, and they are largely irrelevant to John's employment with the City.  What is relevant is that he tested positive and the consequences of that positive test result. The parties also disagree about whether John was selected for drug testing before or while he was on leave in September 2016.  *See* Dkt. 27 ¶ 17; Dkt. 33 at 11–12.  But when the selection occurred is also irrelevant. And there is no genuine dispute to the material fact that John tested positive for cocaine in a drug screening administered on October 19, 2016.

Because of the positive test, John was placed on administrative leave.[48]  Rodriguez sent him a letter explaining the City would hold a pre-determination hearing to decide whether to terminate John.[49]  The letter invited John to attend the meeting and provide relevant information.[50]

After the hearing, Rodriguez sent a letter to John (the First Probation Letter) thanking him for his candor and for taking responsibility.[51]  The letter explained John's paramedic certification was "provisional" and he could not "have any patient contact."[52]  Because "patient contact is a minimum qualification" to be a Paramedic/Firefighter, Rodriguez told John he could not work until his certification was "fully reinstated."[53]

The letter also described the City's "Drug and Alcohol Screening Policy," which "states that it is the City's preference to seek rehabilitation instead of termination after an employee's first violation of the drug policy."[54]  Based on that policy, Rodriguez gave John a "second chance," provided he met certain requirements.[55]  Notably, John had 90 days to get his paramedic certification reinstated and was placed on a 12-month "disciplinary probation."[56]

---

[48] *See Ex. O to Motion: Oct. 24, 2016 Letter from Gil Rodriguez to Patrick John* (Dkt. 27-1 at 244–45).

[49] *Id.*

[50] *Id.*

[51] *Ex. P to Motion: Oct. 28, 2016 Letter From Gil Rodriguez to Patrick John* (Dkt. 27-1 at 246–48) [*First Probation Letter*] at 247.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* at 247–48.

**John's Back Pain Continues**

John visited his health care provider, Clements, again on October 26, 2016.[57]  After this visit, Clements wrote a letter for John to give to his supervisors.[58]  The letter explained that, despite regular treatment since April 2016, John's symptoms were "not resolving" and were "exacerbated with heavy manual labor."[59]  A clinical exam revealed "progressive degeneration of his discs and facet joints of the lumbar spine."[60]  For these reasons, Clements again recommended John "retire from the occupation of fire fighting to protect his health and safety, as well as the safety of his would be patients and co-workers."[61]

At an unspecified date, but sometime after the October 2016 FCE, John wrote a letter to the City.[62]  In the letter, John explained his back pain had increased "to a level that [was] unsafe for [him] to continue [his] job as a Paramedic/Firefighter."[63]  He further explained, "The injuries have progressed to a level that has now made it so that I cannot, with confidence, say that I can do all of my job functions safely when called upon."[64]  He also wrote he was "no longer able to do [his] job as a Paramedic/Firefighter due to [his] injuries."[65]

---

[57] *Clements Depo.* at 28:2–4.

[58] *Id.* at 32:2–23.

[59] *Id.* at 33:6–22.

[60] *Id.* at 33:18–21.

[61] *Id.* at 33:24–34:4.

[62] *Ex. X to Motion: Undated Letter from Patrick John to Murray City* (Dkt. 27-1 at 263–64) [*Undated Letter*]. Although John purports to dispute this letter in part, he "does not dispute that he wrote the letter." Dkt. 33 at 18. Further, the content of his dispute merely points to other evidence in the record.  *See id.*  Accordingly, is undisputed that John expressed the sentiments in the letter.

[63] *Undated Letter*.

[64] *Id.*

[65] *Id.*

John's letter also informed the City that he "should submit [his] application for a medical retirement with the State."[66]  He concluded by stating, "I am giving my resignation on the contingency of the start date of my retirement given to me by the state of Utah."[67]

When deposed, John clarified that the letter accurately portrayed his sentiments at the time he wrote it because his pain had increased and he believed he could no longer do his job.[68]  When his pain increased, he needed accommodations to do his job.[69]  But when it decreased, he could work without accommodations.[70]  He also explained his plans to retire were contingent on receiving "medical retirement," which he never applied for because the City "stopped" him.[71]

**John Returns to Work**

On March 1, 2017, John met with Harris about returning to work.[72]  Harris later sent Rodriguez an email describing the meeting.[73]  According to the email, Harris asked John whether he could "perform the full duties of a firefighter," and John responded that, as of that date, "he [could] work."[74]  But John also said two doctors recommended a medical retirement and he planned to continue working while "seeking a medical retirement," which Utah Retirement

---

[66] *Id.*

[67] *Id.*

[68] *John Depo.* at 109:16–25.

[69] *Id.*

[70] *Id.*

[71] *Id.* at 110:1–16.

[72] Dkt. 27 ¶ 24; *Ex. 16 to Opposition: Mar. 1, 2017 Email From Jon Harris to Gil Rodriguez* (Dkt. 33-1 at 358–59) [*Mar. 2017 Email*].

[73] *Mar. 2017 Email.*  John and the City present diverging viewpoints on what the email conveys.  *See* Dkt. 27 ¶ 24; Dkt. 33 at 14.  Since neither party disputes the email's authenticity, the court quotes directly from the email itself.

[74] *Id.*

Systems said he could do.[75]  Harris's email also explained he avoided giving advice or speculating about the future and "mostly just let [John] vent."[76]

On March 2, 2017, John's paramedic license was reinstated following an investigation by the state licensing entity.[77]  Although his license was reinstated, it was subject to a four-year probation period, with conditions separate from those imposed by the City.[78]

Harris gave John a document with two possible statements.[79]  The first stated John could not perform the essential functions of a Paramedic/Firefighter, but the second stated he could.[80] On March 8, 2017, John signed the second statement, indicating he reviewed the job description for a Paramedic/Firefighter, understood "the physical requirements necessary to perform the essential functions of the job," and could "physically perform the essential functions of the job."[81]  John returned to work that day.[82]

**John Fails the National Paramedic Test**

On March 10, 2017, Rodriguez wrote a letter (the Second Probation Letter) outlining the terms of John's continued probation, which was set to end on October 27, 2017.[83]  The letter explained John was required to "review his medical skills and pass paramedic testing per

---

[75] *Id.*

[76] *Id.*

[77] Dkt. 27 ¶ 22; *Ex. 17 to Opposition: License Reinstatement Letter* (Dkt. 33-1 at 360–61) [*License Restatement Letter*].  The City points out John's license was not reinstated within the ninety days required by the First Probation Letter.  Dkt. 27 ¶ 22.  But according to John, he was given additional time beyond the ninety days to achieve reinstatement.  *John Depo.* at 243:15–20.

[78] *License Reinstatement Letter.*

[79] *See Ex. 18 to Opposition: Mar. 8, 2017 Signed Statement* (Dkt. 33-1 at 362–63).

[80] *Id.*

[81] *Id.*

[82] Dkt. 27 ¶ 36.

[83] *Ex. BB to Motion: Mar. 10, 2017 Probation Letter* (Dkt. 27-1 at 287–89) [*Second Probation Letter*].

department and national testing standards."[84]  John was required to do this because of "skill

degradation" and because his "paramedic license was on provisional status and recently

reinstated."[85]  The letter also explained that John's direct supervisor would complete monthly

"probationary reports" to update Harris about his progress and compliance.[86]

John took his national paramedic test on October 13, 2017.[87]  The test was administered

by a medical division chief from a different fire department.[88]  The tester concluded John "failed

to perform on all three of the evaluation scenarios and did not demonstrate adequate paramedic

capability or proficiency."[89]

John disputes the test result because he remembers passing the test.[90]  During his

deposition, he said he was "[b]lown away" by the official results, but he stated this was not based

on anything the tester said.[91]  Instead, he thought he passed because after the test, he printed off

the national standards, recalled how he tested, and believed he met the standards.[92]

But the tester's letter detailed John's failures, including: "incorrect medication choices,"

"not conduct[ing] any sort of medical evaluation," "not adequately protect[ing] his fellow

providers from harm during . . . defibrillation procedures," and failing to "exhibit any leadership

---

[84] *Id.* at 288.

[85] *Id.*

[86] *Id.*

[87] Dkt. 27 ¶ 46.

[88] *Id.*

[89] *Id.*; *Ex. GG to Motion: Joseph Mittelman Declaration and Oct. 13, 2017 Letter* (Dkt. 27-1 at 378–82) [*2017 Test Results*] at 382.  John disputes this fact in part because he remembers passing the test.  *See* Dkt. 33 at 23.  He also cites a performance appraisal and probationary reports indicating he was meeting expectations.  *Id.*  But he does not dispute the authenticity of the 2017 Test Results.

[90] Dkt. 33 at 23; *see also John Depo.* at 260:4.

[91] *John Depo.* at 260:5–25.

[92] *Id.* at 260:9–25.

or team direction."[93]   The tester described John as seeming "complacent and lackadaisical in his

approach to a critical medical situation and caus[ing] unnecessary delay in performing life-

saving procedures."[94]

**October 2017 Pre-Disciplinary Hearing**

Following the test failure and in anticipation of John's twelve-month probationary period

ending, Rodriguez scheduled a pre-disciplinary hearing.[95]   A pre-disciplinary notice stated

feedback from John's supervisors indicated he was still behaving inappropriately and not

meeting the probation terms.[96]

The pre-disciplinary hearing was on October 19, 2017.[97]   It was attended by John,

Rodriguez, Harris, and the City's human resources director.[98]   After the hearing, Rodriguez

issued a disciplinary decision letter (the Third Probation Letter).[99] The letter stated John had not

fulfilled the probation terms because he did not pass the national paramedic test within 90 days

and had not taught the required classes on medical documentation.[100]   The letter also explained

John's reports continued "to include errors and lack[] detail" and he continued to "make mistakes

in the field."[101]   Rodriguez also faulted John for poor communication, lack of initiative, and

---

[93] *2017 Test Results* at 4.

[94] *Id.*

[95] *See* Dkt. 27 ¶ 48.

[96] *Ex. HH to Motion: Oct. 13, 2017 Pre-Disciplinary Notice* (Dkt. 27-1 at 383–85).  John disputes many of the statements in this letter and presents contrary evidence from his supervisors' reports and deposition testimony.  *See* Dkt. 33 at 24–28.  However, the specific reasons given for the October 2017 pre-disciplinary hearing are not material to resolving the issues raised by the Motion.  Accordingly, neither the specific reasons given nor the contrary evidence cited by John are included in the record for purposes of summary judgment.

[97] Dkt. 27 ¶ 48; *Ex. II to Motion: Oct. 24, 2017 Disciplinary Decision Letter* (Dkt. 27-1 at 386–89) [*Third Probation Letter*] at 2.

[98] *Third Probation Letter* at 387.

[99] *See id.*

[100] *Id.* at 388.

[101] *Id.*

having a negative attitude.[102]  He further included that the "medical director" questioned whether John should work as a paramedic.[103]

Despite these concerns, the City decided to give John "another opportunity" and extended John's probationary period by another twelve months.[104]  During that period, he was required to meet certain conditions, including passing the national paramedic test within 90 days, teaching classes to his coworkers, and signing monthly probationary reports.[105]

**November 2017 Back Injury**

On November 24, 2017, John reaggravated his back injury while lifting a patient.[106]  He filed a workers' compensation claim for this injury.[107]  On December 4, he went to Clements for treatment.[108]  Clements issued a work restriction note recommending John be allowed "to modify bending, lifting, twisting, carrying, stooping, kneeling as tolerated while being treated for the next 6-8 weeks."[109]

During the restriction period after this injury, John met with Harris "every morning" to discuss light-duty work assignments for the day.[110]  At several of these meetings, John

---

[102] *Id.*

[103] *Id.*

[104] *Id.* at 388.  The parties dispute whether Rodriguez solely made this decision or whether he was influenced by others—specifically, Harris.  *See* Dkt. 27 ¶¶ 51–53; Dkt. 33 at 28; Dkt. 41 at 4–5.  However, this dispute is immaterial because John's legal claims relate to the decision to terminate and the degree to which his injuries and workers' compensation claims influenced his supervisors.  *See infra* Analysis section.  John was not terminated by the Third Probation Letter, and it does not mention his injuries.  Therefore, the degree to which Rodriguez was influenced by others in drafting the Third Probation Letter is irrelevant.

[105] *Third Probation Letter* at 388–89.

[106] Dkt. 27 ¶ 26.

[107] *Id.* ¶ 4.

[108] *Ex. T to Motion: Dec. 4, 2017 Letter from Stephen Clements* (Dkt. 27-1 at 255–56).

[109] *Id.*

[110] *John Depo.* at 178:6–10.

remembers Harris making disparaging remarks.  For example, Harris told John that light-duty assignments were "unacceptable, especially [for] somebody on probation" who was trying to prove he wanted to keep his job.[111]  According to John, Harris seemed "really frustrated and angry" and repeatedly said some version of, "Well what are we going to do with you today?"[112]  Harris also "forced him to complete tasks," like cleaning the gear room, "that were outside of his medical restrictions, causing him further pain."[113]

On January 2, 2018, Clements released John for "regular work."[114]  After a follow-up visit on January 12, Clements confirmed John was released to "full work duty."[115]  But he reiterated his opinion that "the heavy duty of fire fighting may exacerbate [John's] symptoms and slow his recovery.  It would be in his best interest to work in an occupation that is not heavy duty or manual labor due to his low back."[116]

According to John, Harris read Clements's letter and said, "What do you mean you've got your release [to] full duty but he recommended that?  This is ridiculous."[117]  After this comment, John did not request any more accommodations because he was "sick of asking."[118]

**John's Monthly Probation Reports**

John continued to receive monthly performance reviews as part of his probation.[119]  From October 2017 through December 2017, the reports were "mixed."[120]  However, from January

---

[111] *Id.* at 180:19–181:3.

[112] *Id.* at 181:18–183:1.

[113] *Id.* at 179:18–180:12.

[114] *Ex. U to Motion: Jan. 2, 2018 Letter from Stephen Clements* (Dkt. 27-1 at 257–58).

[115] *Ex. V to Motion: Jan. 12, 2018 Letter from Stephen Clements* (Dkt. 27-1 at 259–60).

[116] *Id.*

[117] *John Depo.* at 183:12–21.

[118] *Id.* at 185:15–20.

[119] *See* Dkt. 27 ¶¶ 55–56.

[120] *Id.* ¶ 55.

through May 2018, John's supervisor noted he was improving and rated him as "meeting expectations."[121]  John signed each of these reports.[122]

In the June 2018 report, the supervisor rated John as "needing improvement" in the categories of safety, following instructions, and fire skills.[123]  These ratings were based on three incidents.

First, John "jeopardized his safety during a defensive fire operation" when he entered a burning and abandoned building that his captain and crew told him not to enter (the Fire Incident).[124]  This was an "unreasonable risk" because there was a partially collapsed wall and "heavy smoke."[125]

Second, John accidentally exposed himself to a needlestick by recapping a bent needle (the Needle Stick Incident).[126]  The supervisor explained that recapping a bent needle is "against standard paramedic practice and should be avoided."[127]

Third, the supervisor received reports that John had "been driving the ambulance recklessly and going back to his old ways with attitude."[128]

John thought the June 2018 report was inaccurate and refused to sign it.[129]

---

[121] *Id.* ¶ 56.

[122] Dkt. 33 at 29.  *See generally Ex. JJ to Motion: Probationary Reports for Performance of Patrick John from Nov. 2017 to July 2018* (Dkt. 27-1 at 390–405) [*2017-18 Probation Reports*].

[123] *2017-18 Probation Reports* at 15–16.

[124] *Id.* at 404.

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *Id.* at 405.

[129] *Id.*; *see also* Dkt. 33 at 29.

**John's Annual Performance Review**

In late August, John's supervisor completed his annual performance review.[130]  This review covered the period from July 2017 to July 2018.[131]  John received an overall rating of 1.75 out of 3, which qualified as not meeting expectations.[132]

At this point, Harris was the chief because Rodriguez retired.[133]  Harris received John's performance review, placed John on paid administrative leave, and sent him a notice for a pre-disciplinary hearing.[134]  The notice described concerns about John's probation history and annual performance review score.[135]  It stated he had "shown improvement in paramedic skills and testing," but on the whole his "job performance remain[ed] unacceptable and [did] not meet expectations."[136]  In support, he listed two reports of unsafe driving, the Needle Stick Incident, the Fire Incident, and probation reports stating John's communication, attitude, and teamwork needed improvement.[137]

---

[130] *Ex. KK to Motion: 2018 Performance Review of Patrick John* (Dkt. 27-1 at 406–20) [*2018 Performance Review*] at 407.

[131] *Id.*

[132] *Id.* at 420.

[133] Dkt. 27 ¶ 60.

[134] *Ex. LL to Motion: Aug. 20, 2018 Letter from Jon Harris to Patrick John* (Dkt. 27-1 at 421–22); *Ex. PP to Motion: Aug. 21, 2018 Pre-Disciplinary Notice* (Dkt. 27-1 at 439–42) [*Aug. Pre-Disciplinary Notice*].

[135] *Aug. Pre-Disciplinary Notice* at 440–41.

[136] *Id.* at 440.

[137] *Id.* at 440–41.

**Clements's Recommendation**

Clements treated John again on August 22, 2018.[138]  This was John's first visit with Clements since January 2018.[139]

After the visit, Clements wrote a letter expressing concerns about John's symptoms and lack of progress.[140]  Despite John's diligent efforts, there was no improvement, and his symptoms had increased.[141]  Because Clements believed John would need "pain management for life," he again recommended John quit working as a Paramedic/Firefighter "to protect his health and safety, as well as the safety of his would be patients and co-workers."[142]  Clements also explained he told John his "judgment may be impaired" while taking prescribed opioids, "which could endanger himself or others he may be required to help in an emergency situation."[143]

During his deposition, Clements stated the letter was the culmination of multiple recommendations that John not work as a Paramedic/Firefighter.[144]  He continued:

> [C]ould he physically do it?  He was physically doing it, but he was doing it with pain.  So I'll clarify, I think because of his pain I don't think he should have continued or I don't think he should continue.  But I guess can I say can he physically do it?  Well, I think he can physically do it . . . . I don't recommend it, but he can physically do it with pain.[145]

---

[138] *Ex. W to Motion: Aug. 22, 2018 Letter from Stephen Clements* (Dkt. 27-1 at 261–62) [*Aug. 2018 Clements Letter*].  John purports to dispute this letter in part.  *See* Dkt. 33 at 13–14.  But the dispute merely references other evidence in the record to add context.  Thus, he does not dispute the letter or its content, but merely seeks to contextualize it.

[139] *Clements Depo.* at 57:9–21.

[140] *See Aug. 2018 Clements Letter.*  Clements gave the letter to John but did not know if John gave the letter to the City.  *See Clements Depo.* 65:21–66:6.

[141] *Aug. 2018 Clements Letter* at 262.

[142] *Id.*

[143] *Id.*

[144] *Clements Depo.* at 70:12–17.

[145] *Id.* at 70:18–25.

**The City Terminates John**

John's pre-disciplinary hearing was on August 28, 2018.[146]  At the hearing, John was able to present his "version of the facts" and other information he considered relevant.[147]  Harris, two assistant chiefs, and the City's human resources director attended the hearing and later investigated concerns John raised.[148]

After the investigation, the City terminated John on September 6, 2018.[149]  Harris wrote John a letter explaining the reasons for the termination.[150]  For example, the letter described concerns about attitude, reckless driving, lack of initiative, and the Needle Stick Incident.[151]

There was also a detailed paragraph about the Fire Incident.[152]  Harris described the incident as "disturbing" because John "disobeyed orders" when he entered the burning and abandoned building.[153]  Moreover, John's response to the incident was "troubling" because he said he only went "one step" into the building, but an investigation concluded he went "7 to 15 feet inside" the building and another firefighter had to "pull many feet of [his] firehose backwards before [he] became visible."[154]  And after his crew left for another assignment, John

---

[146] *Ex. UU to Motion: Termination Letter* (Dkt. 27-1 at 461–65) [*Termination Letter*] at 463.

[147] *Id.*

[148] *Id.*

[149] Dkt. 33 at 46.

[150] *Termination Letter* at 462–65.

[151] *Id.* at 462–63.

[152] *Id.* at 463–64.  John disputes the City's description of the Fire Incident, but he does not dispute that the termination letter described the incident as stated. *See* Dkt. 33 at 37.  The court finds John's disputes genuine and presents the Termination Letter's findings not for the truth of the matter, but rather to reflect what the City cited as its justification for terminating John.  So although John's disputes about the Fire Incident are genuine, they are not material.

[153] *Id.* at 463.

[154] *Id.*

"continued to spray water, or to 'freelance.'"[155]  Although John promised not to repeat this behavior, he did "the same thing" while "in the extended probationary period."[156]

The Letter emphasized John's behavior was troubling because he was "on *extended* disciplinary probation."[157]  The Letter did not mention John's injuries or workers' compensation claims.

**John's Complaint and the City's Motion for Summary Judgment**

In January 2019, John filed a Charge of Discrimination with the Equal Employment Opportunity Commission.[158]  He initiated this action on September 17, 2019,[159] bringing five causes of action against the City: (1) disability discrimination in violation of the Americans with Disabilities Act (ADA), (2) failure to engage in the interactive process or make reasonable accommodations in violation of the ADA and the Rehabilitation Act, (3) retaliation in violation of the ADA, (4) disability discrimination in violation of the Rehabilitation Act, and (5) wrongful termination.[160]  The first four are federal claims, and the fifth is brought under Utah state law.[161]

On August 30, 2021, the City moved for summary judgment on all John's claims.[162] Following full briefing on the Motion,[163] the court heard oral argument on May 19, 2022, and took the matter under advisement.[164]

---

[155] *Id.*

[156] *Id.* at 464.

[157] *Id.* at 463.

[158] *Exhibit VV to Motion: Charge of Discrimination* (Dkt. 27-1 at 466).

[159] *See Complaint* (Dkt. 2).

[160] *Id.* at 10–15.

[161] *See id.*

[162] *See* Dkt. 27.

[163] *See* Dkt. 33; Dkt. 41.

[164] *Minute Entry for May 19, 2022 Hearing* (Dkt. 44).

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."[165]  A fact is material if it "might affect the outcome of the suit under the governing law."[166]  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[167]

The moving party bears the burden "of showing beyond a reasonable doubt that it is entitled to summary judgment."[168]  This is true even if "the moving party does not have the ultimate burden of persuasion at trial."[169]  The moving party may carry its burden "either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."[170]  If the moving party does not carry this burden, then "the nonmoving party has no obligation to produce anything, even if [it] would have the ultimate burden of persuasion at trial."[171]

The court views "the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."[172]  But the court does not weigh the evidence, make credibility determinations, or draw legitimate inferences from the facts.[173]  That is the role of a jury.[174]

---

[165] Fed. R. Civ. P. 56(a).

[166] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[167] *Id.*

[168] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation and quotations omitted).

[169] *Id.*

[170] *Id.*

[171] *Id.* (citation omitted).

[172] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[173] *Liberty Lobby*, 477 U.S. at 255.

[174] *Id.*

## ANALYSIS

The City moved for summary judgment on all John's claims.[175]  As explained below, the court concludes the City is entitled to summary judgment on all John's claims except for his claim that the City violated the Rehabilitation Act by failing to accommodate him so he could continue working as a Paramedic/Firefighter.

### I.   Disability Discrimination Claims (First and Fourth Causes of Action)

John claims the City committed disability discrimination in violation of the ADA and the Rehabilitation Act.[176]  John bases these claims on the City's decision to terminate him.[177]  He does not base these claims on other decisions the City made during his employment.[178]

The City argues undisputed material facts prevent John from establishing either of these claims.[179]  It challenges both claims in tandem because of the substantive overlap between the two statutes.[180]  For example, the Rehabilitation Act states, "The standards used to determine whether [the Act] has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under" the analogous sections of the ADA.[181]  Because this and other provisions explicitly incorporate the relevant standards of the ADA, the Tenth Circuit has stated "decisions under both Acts apply interchangeably."[182]  Accordingly, the court will analyze both claims together.

---

[175] Dkt. 2 at 10–12, 14–15.

[176] *Id.*

[177] *See id.* ¶¶ 78, 102.

[178] *See id.*

[179] Dkt. 27 at 29–36.

[180] *See id.*

[181] *See* 29 U.S.C. § 794(d).

[182] *See Vidacak v. Potter*, 81 F. App'x 721, 723 (10th Cir. 2003).

"To establish a prima facie case of discrimination under the ADA, [John] must show: (1) [he] is disabled within the meaning of the ADA; (2) [he] is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) [he] was discriminated against because of [his] disability."[183]

In its Motion, the City focuses on the second and third elements, asserting (A) John "was not 'qualified'"[184] and (B) John "cannot show any evidence of disability bias."[185]  The court concludes there is a genuine issue of material fact as to whether John was qualified to perform the "essential functions" of a Paramedic/Firefighter.  But the City has shown John does not have sufficient evidence to establish he was discriminated against because of his disability.  The City is thus entitled to summary judgment on both disability discrimination claims.

### A. There is a genuine issue of material fact as to whether John was qualified to perform the "essential functions" of a Paramedic/Firefighter.

To make a prima facie showing of discrimination, John must show he was "qualified, with or without reasonable accommodation, to perform the essential functions of" a Paramedic/Firefighter.[186]  The City argues John was not qualified when the City terminated him.[187]  Although the undisputed evidence could support this conclusion, it could also support the opposite conclusion.  Thus, the City has failed to show no reasonable jury could find John was qualified to work as a Paramedic/Firefighter.

---

[183] *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004).  For comparison, "[t]he four elements of a prima facie claim [under the Rehabilitation Act] are (1) that the plaintiff is disabled under the Act; (2) that [the plaintiff] would be otherwise qualified to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency); and (4) that the program has discriminated against the plaintiff."  *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004).  Although these elements differ slightly from an ADA claim, there is no meaningful distinction with respect to the elements the City challenges.  *See* Dkt. 27 at 29–31.

[184] Dkt. 27 at 29–31.

[185] *Id.* at 31–36.

[186] *Mason*, 357 F.3d at 1118.

[187] Dkt. 27 at 29–31; Dkt. 41 at 17–19.

Courts use a two-step inquiry to decide whether an employee was qualified to perform the essential functions of the job.[188]  "First, the court determines whether the individual can perform the essential functions of the job."[189]  Second, if the individual cannot perform the essential functions, "the court determines whether any reasonable accommodation by the employer would enable [the individual] to perform those functions."[190]

According to the official job description, a Paramedic/Firefighter "must be able to move objects between 20-50 pounds short distances (20 feet or more), perform duties requiring pulling of 40 pounds or more . . . , as well as frequently lift objects weighing 50 to 100 lbs."[191]  The City argues John was unable to work as a Paramedic/Firefighter based on the following evidence: the FCE Report's "valid concerns about his ability to successfully complete this type of work in the future";[192] John's undated letter after the FCE in which he described increased pain that made it "unsafe for [him] to continue [his] job as a Paramedic/Firefighter";[193] and Clements's opinion that "John could no longer safely perform his job as a Paramedic/Firefighter."[194]

In response, John characterizes Clements's opinion as indicating a future risk of John being unable to work and not as stating John "was *unable to* physically perform his work duties."[195]  He also points to deposition testimony from Clements that John could "physically do [his job] with pain."[196]

---

[188] *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003).

[189] *Id.*

[190] *Id.*

[191] *Job Description* at 97.

[192] Dkt. 27 at 30–31 (quoting *FCE Report* at 239).

[193] *Id.* at 31 (quoting *Undated Letter* at 264).

[194] *Id.* (citing *Clements Depo.* at 71:22–72:9).

[195] Dkt. 33 at 57.

[196] *Id.* (quoting *Clements Depo.* at 70:23–25).

Viewing the undisputed evidence in the light most favorable to John,[197] a reasonable jury could conclude John was qualified to work as a Paramedic/Firefighter. Clements testified John could physically perform with pain. He strongly advised against John continuing as a Paramedic/Firefighter, but he stopped short of stating he was physically unable to do so. Further, the fact that John's letter is undated leaves the weight of that evidence in flux. During his deposition, John characterized the letter as accurately portraying his feelings at the time he wrote it, but noted he later felt confident he could work.[198] He explained that between 2006 and 2018, his "pain would increase and decrease."[199] If his pain increased, he could do his job with accommodation, but when it decreased, he could work without accommodations.[200]

In sum, there are issues of material fact concerning whether John was qualified to perform the essential functions of a Paramedic/Firefighter at the time he was terminated. As such, the City has failed to carry its burden on this element of John's disability discrimination claims.

### B. There is no genuine dispute of material fact as to whether John was discriminated against because of his disability.

To make a prima facie showing of disability discrimination, John must show he "was discriminated against because of [his] disability."[201] The City argues John has not shown his disability was a determining factor in the City's decision to terminate him.[202] John essentially

---

[197] *See Nash Oil & Gas*, 526 F.3d at 629.

[198] *See John Depo.* at 107:1–109:25.

[199] *Id.* at 102:11–13.

[200] *Id.* at 103:1–5.

[201] *Mason*, 357 F.3d at 1118.

[202] Dkt. 27 at 31–36.

concedes he has no direct evidence of discrimination, but he argues there is a dispute of material fact under the *McDonnell Douglas* burden-shifting analysis.[203]

The *McDonnell Douglas* burden-shifting analysis is used when the employee has no "direct evidence of discrimination" and the employer argues it did not rely on disability when making the termination decision.[204]  Under this framework, the employee must first establish a "prima facie case of wrongful termination," then the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."[205]  If the employer carries that burden, "'the burden shifts back to the [employee] to demonstrate that the employer's justification is pretextual'—not the true reason for the employment decision—by a preponderance of the evidence."[206]

John does not address the first two steps of the *McDonnell Douglas* analysis and instead goes straight to the pretext analysis.[207]  He argues the City's justification is pretextual because his inadequacies were caused by his injuries[208] and because he "was subject to unusual scrutiny and treated differently than the other employees."[209]  He cites a series of examples that he contends show him being subject to unusual scrutiny.[210]

In response, the City contends John has failed to make a prima facie case of disability discrimination.[211]  However, for purposes of summary judgment, courts routinely assume

---

[203] Dkt. 33 at 58; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

[204] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 n.3 (10th Cir. 1997).

[205] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969–70 (10th Cir. 2017).

[206] *Id.* at 970 (quoting *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 539 (10th Cir. 2014)).

[207] Dkt. 33 at 58–67.

[208] *Id.* at 59–60.

[209] *Id.* at 61.

[210] *Id.* at 61–66.

[211] *See* Dkt. 41 at 19–21.  The City argues John has not made a prima facie case, but it also responds to the substance of his pretext arguments.  *See* Dkt. 41 at 21–26.

without deciding that the employee created an issue of material fact as to their prima facie burden.[212]  The court takes that approach here and analyzes whether John can show the City's justifications were pretextual.  As explained below, John has not provided even circumstantial evidence that the City's justifications were pretextual.

In a pretext analysis, the "relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[213]  And an employee's "allegations alone will not defeat summary judgment."[214]

The City cites testimony from Harris and others showing they "honestly believed" John's conduct supported termination and "acted in good faith upon those beliefs."[215]  In John's termination letter, Harris wrote, "[W]e believe it is important to understand that [John's] behavior must be viewed in the context of an employee who is on *extended* disciplinary probation."[216]  The letter documents other concerns with John's employment, such as the Fire Incident, the Needle Stick Incident, reports of reckless driving, and his "does not meet expectations" annual performance review.[217]

John, however, argues these justifications are pretextual because he was treated differently than his similarly situated but nondisabled coworkers.[218]  Specifically, he argues he

---

[212] *See, e.g., Morgan*, 108 F.3d at 1324 ("For purposes of our summary judgment review, we assume without deciding that Morgan has demonstrated a genuine issue of fact as to each aspect of the prima facie case described above.").

[213] *Luster v. Vilsack*, 667 F.3d 1089, 1094 (10th Cir. 2011) (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004)).

[214] *Morgan*, 108 F.3d at 1324.

[215] Dkt. 41 at 28 (quoting *Luster*, 667 F.3d at 1094); *see also* Dkt. 27 at 33–36.

[216] *Termination Letter* at 463.

[217] *Id.* at 463–64.

[218] Dkt. 33 at 61–66.

was the only employee reprimanded for inadequate medical documentation[219] and for incidents like the Needle Stick Incident.[220]  But the City argues those two incidents were not the sole basis for its termination decision.[221]  As explained, it argues it terminated John for several reasons, including the Fire Incident, reports of reckless driving, his failure to meet probation conditions, and his "does not meet expectations" performance review.[222]  And John has not provided evidence that another employee had similar inadequacies but was treated differently.

In this regard, John is like the employee in *Morgan v. Hilti, Inc.*[223]  In *Morgan*,  an employer argued it terminated an employee because of her "unscheduled absenteeism."[224]  The employee did not contest the employer's record of her absences.[225]  Rather, she argued that she was not disciplined until the employer learned of her disability, that "no other employee's attendance was so closely monitored," and "that her year-end reviews showed no problem with her job performance except for the absenteeism issue."[226]  The district court granted summary judgment in the employer's favor, and the Tenth Circuit affirmed.[227]

The Tenth Circuit explained the employee could have supported her pretext argument by showing "similarly situated employees, who do not belong to the protected class, were treated differently."[228]  But the employee did not show that another employee "had a record of

---

[219] *Id.* at 61–62.

[220] *Id.* at 63–64.

[221] Dkt. 27 at 33–36.

[222] *Id.*; *see also Termination Letter* at 463–64.

[223] 108 F.3d 1319 (10th Cir. 1997).

[224] *Id.* at 1324.

[225] *Id.*

[226] *Id.*

[227] *Id.* at 1322.

[228] *Id.* at 1324.

unscheduled absences similar to her own."[229]  Rather, she relied on her own allegations, and an employee's "allegations alone will not defeat summary judgment."[230]

Like the employee in *Morgan*, John has not shown that other employees had a record of inadequacies similar to his own.  Nor has he provided any evidence of pretext other than his own allegation that he "believe[d]" he was terminated because of his disability.[231]  That allegation alone cannot defeat summary judgment.[232]

John also argues the City's stated justifications were pretextual because his disability caused his inadequacies.[233]  But his only support is the FCE Report's conclusion that "he would experience pain while working" and his own deposition testimony that he was in pain and accommodations would have helped.[234]  Although it is undisputed that John was in pain, that fact does not show his inadequacies were caused by his disability.  And John's assertion that accommodations "would [have] help[ed] him out" in some unspecified way cannot prevent summary judgment.[235]

Viewing the undisputed facts in the light most favorable to John, there is not sufficient evidence that the City's justifications for terminating him were pretextual.  Thus, the City has carried its burden of showing John does not have enough evidence to demonstrate the City terminated him because of his disability.  The City is accordingly entitled to summary judgment on John's disability discrimination claims.

---

[229] *Id.*

[230] *Id.*

[231] Dkt. 33 at 37 & n.176 (citing *John Depo.* at 21:10–24).

[232] *Morgan*, 108 F.3d at 1324.

[233] Dkt. 33 at 59–60.

[234] *Id.* at 60.

[235] *See id.* (quoting *John Depo.* at 84:3–5); *see also Morgan*, 108 F.3d at 1324.

II.    **Failure to Engage in an Interactive Process or Provide Reasonable Accommodations in Violation of the ADA and the Rehabilitation Act (Second Cause of Action)**

John claims the City failed to provide him with reasonable accommodations and engage in an interactive process with him to find appropriate accommodations.[236]  He asserts this in a single cause of action but under two substantive legal bases: the ADA, 42 U.S.C. § 12112(b)(5)(A), and the Rehabilitation Act, 29 U.S.C. § 794(a).[237]

The City briefs its arguments separately by statute.[238]  The court will also address each statute individually.  As explained below, John's ADA claim is time-barred by the applicable statute of limitations, so the City is entitled to summary judgment on that claim.  But the City is entitled to only partial summary judgment on John's Rehabilitation Act claim.

**A.  John's ADA claim is time-barred.**

The City argues John's ADA claim is time-barred by the applicable statute of limitations.[239]  John argues it is not time-barred because he has alleged a "continuing violation" under the ADA.[240]  The court concludes John has not alleged a continuing violation and thus his ADA claim is time-barred.

For ADA claims, the employee must file the charge of discrimination within 300 days of the alleged violation.[241]  But "under proper circumstances, [an employee] may recover for discriminatory acts that occurred prior to the statutory limitations period if they are part of a continuing policy or practice that includes the act or acts within the statutory period."[242]  An

---

[236] Dkt. 2 ¶¶ 85–86.

[237] *Id.* ¶ 86.

[238] Dkt. 27 at 25–29.

[239] *Id.* at 25–26.

[240] Dkt. 33 at 50–51.

[241] *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

[242] *Davidson*, 337 F.3d at 1183 (quotations and citation omitted).

employee "may establish a continuing violation by showing either that (1) a series of related acts was taken against him, with one or more those acts *occurring within the limitations period*, or (2) the defendant maintained a company-wide policy of discrimination both *before and during the limitations period*."[243]  Accordingly, even under a continuing-violation theory, there must have been a discriminatory act within the limitations period.[244]

John filed his Charge of Discrimination on January 10, 2019.[245]  The 300-day statute of limitations requires the alleged violation to have occurred sometime between March 16, 2018, and January 10, 2019.[246]  But "John does not dispute that he did not seek accommodations after January 2018."[247]  Accordingly, the City is correct that John cannot show there was a failure to accommodate within the relevant time period.

John nevertheless argues he has adequately alleged a continuing violation based on his testimony that Harris would "continually express[] frustration" with John when he was on light-duty restrictions, making disparaging remarks like "Well what are we going to do with you today?"[248]  But John has not asserted he requested accommodations after January 2018, and even under a continuing-violation theory, there must have been a discriminatory act (here, a failure to accommodate) within 300 days of when he filed his Charge of Discrimination.[249]  Without a discriminatory act, there cannot be a continuing violation.  Accordingly, John's failure to

---

[243] *Id.*

[244] *See id.*; *see also Paystrup v. Benson*, No. 2:13-cv-00016-DB, 2015 WL 506682, at *7 (D. Utah Feb. 5, 2015) (explaining "certain actions are not time barred if they are part of a continuing violation and at least one similar discriminatory action occurred within the relevant statute of limitations").

[245] *Charge of Discrimination.*

[246] *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 109.

[247] Dkt. 33 at 16.

[248] *Id.* at 51 (quoting *John Depo.* 182:24–183:1).

[249] *See Davidson*, 337 F.3d at 1183.

accommodate claim based on the ADA is time-barred because he did not file his Charge of

Discrimination within 300 days of an alleged violation.

**B.  The City is entitled to partial summary judgment on John's Rehabilitation Act claim.**

The City argues it accommodated John during the time period relevant to his

Rehabilitation Act claim.[250]  The court concludes there is a genuine dispute of material fact

concerning whether the City accommodated John so that he could continue working as a

Paramedic/Firefighter.  But the court also concludes there is not a genuine dispute of material

fact concerning John's requests for reassignment.  Accordingly, the City is entitled to partial

summary judgment on this claim insofar as it is based on John's argument that the City should

have reassigned him.

"To state a claim for failure to accommodate under the Rehabilitation Act, [John] must

show that he (1) is disabled; (2) is otherwise qualified; and (3) requested a plausibly reasonable

alternative."[251]  The "otherwise qualified" element involves two inquiries: "First, whether a

reasonable accommodation would enable the employee to do the particular job. . . . Second,

whether the employee could be transferred to other work which could be done with or without

accommodation."[252]  Although this second inquiry contemplates reassignment, reassignment is

---

[250] Dkt. 27 at 226–29.

[251] *Brown v. Austin*, 13 F.4th 1079, 1084–85 (10th Cir. 2021) (quotation simplified).  The City cites the elements for a prima facie case of failure to accommodate under the ADA.  *See* Dkt. 27 at 27 (citing *Spielman v. Blue Cross & Blue Shield of Kan., Inc.*, 33 F. App'x 439, 443 (10th Cir. 2002)).  Although courts often cite ADA cases when discussing the Rehabilitation Act, *see Cummings v. Norton*, 393 F.3d 1186, 1190 n.2 (10th Cir. 2005), the court relies on the elements for a Rehabilitation Act claim as stated by the Tenth Circuit.

[252] *Woodman v. Runyon*, 132 F.3d 1330, 1340 (10th Cir. 1997) (quoting *Gonzagowski v. Widnall*, 115 F.3d 744, 747 (10th Cir. 1997)).

generally required only if the employee cannot continue in their current position with accommodations.[253]

An employer's obligation to provide reasonable accommodations includes an "obligation to engage in an interactive process."[254]  This process "must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job."[255]  Both parties then "have an obligation to proceed in a reasonably interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the [organization] and, if so, to identify an appropriate reassignment opportunity if any is reasonably available."[256]  There are "no rules of universal application" for this process, though it "necessarily includes good-faith communications between the employer and employee."[257]

But even if an employer does not satisfy its interactive obligations, the employee is not "entitled to recovery unless [the employee] can also show that a reasonable accommodation was possible."[258]  So with respect to reassignment, although "a vacant position may come to light as

---

[253] *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1170 (10th Cir. 1999) ("When an employer selects among several possible reasonable accommodations, the preferred option is always an accommodation that keeps the employee in his or her existing job if that can reasonably be accomplished."); *see also* 29 C.F.R. § 1614.203(d)(3)(i)(B) (2017) (explaining that federal agencies should adopt procedures "that the agency must consider providing reassignment to a vacant position as a reasonable accommodation when it determines that no other reasonable accommodation will permit an employee with a disability to perform the essential functions of his or her current position"); 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) (2016) ("In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship.").

[254] *Smith*, 180 F.3d at 1172.

[255] *Id.* at 1171–72 (footnote omitted).

[256] *Id.* at 1172.

[257] *Aubrey v. Koppes*, 975 F.3d 995, 1007 (10th Cir. 2020) (brackets omitted) (quoting *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004)).

[258] *Smith*, 180 F.3d at 1174.  *See also Brigham v. Frontier Airlines, Inc.*, 57 F.4th 1194, 1201 (10th Cir. 2023) ("But the failure to engage in an interactive process is not independently actionable under the Act.").

part of the interactive process,"[259] at the summary judgment stage the employee "must establish that he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment."[260]

John argues the City failed to accommodate him because it did not give him "the accommodations requested by his medical provider"[261] and did not reassign him.[262]  The City asserts it accommodated John by providing light-duty work.[263]  It further argues John has not identified vacant positions he was qualified for.[264]

The court first establishes the relevant timeframe.  It then concludes there is a genuine dispute of material fact concerning whether the City accommodated John so he could continue as a Paramedic/Firefighter.  Next, the court concludes the City is entitled to partial summary judgment on this claim insofar as it is based on the City's failure to reassign John.

### 1.  The relevant timeframe is September 17, 2015, to January 2, 2018.

Rehabilitation Act claims must be filed "within four years of the discriminatory action."[265]  John filed his Complaint on September 17, 2019,[266] so the discriminatory act must have occurred on or after September 17, 2015.  But John admits he did not seek accommodations after January 2, 2018.[267]  Accordingly, the question is whether the City failed to accommodate John between September 17, 2015, and January 2, 2018.

---

[259] *Duvall v. Georgia-Pac. Consumer Prods., L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010).

[260] *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999).

[261] Dkt. 33 at 53–55.

[262] *Id.* at 52–53.

[263] Dkt. 27 at 26–28.

[264] *Id.* at 29.

[265] *Paystrup*, 2015 WL 506682, at *7.

[266] *See* Dkt. 2.

[267] Dkt. 33 at 16; *see also* Dkt. 27 ¶¶ 27–28.

**2.  There is a genuine dispute of material fact concerning whether the City accommodated John so he could continue as a Paramedic/Firefighter.**

John argues the City failed to accommodate him because it did not provide "accommodations requested by his medical provider" and did not allow him to "stand back" when he was in pain.[268]  In response, the City contends it provided the requested accommodations.[269]  The court concludes there is a genuine issue of material fact concerning whether the City accommodated John so he could continue working as a Paramedic/Firefighter.

First, there is a genuine dispute about whether the City accommodated John after his November 2017 injury.  John testified that after his November 2017 injury, Harris "forced him to complete tasks that were outside of his medical restrictions."[270]  For example, Harris required him to clean the gear room, which John testified was outside his medical restrictions, and move boxes that were outside of his lifting restrictions.[271]  John testified he told Harris "several times" that these tasks were outside of his restrictions and "may cause" pain.[272]  But Harris "ordered" John to "keep going."[273]  This testimony is sufficient to create a genuine issue of material fact concerning whether the City accommodated John after his November 2017 injury.

---

[268] *Id.* at 54–55.  John testified that the accommodation he needed "to do the job of a paramedic/firefighter" was the "ability to stand back when [he] was hurt."  *John Depo.* at 86:1–4.  When counsel for the City asked if he needed anything else, John responded, "I couldn't imagine another thing that would help that I could do at the fire department."  *Id.* at 86:5–8.  Yet John also testified he asked for other accommodations, like the ability to take more breaks or start work at a different time.  *Id.* at 175:1–13.  But in his Opposition, John does not argue the City failed to accommodate him when he requested to take more breaks or start work at a different time.  *See* Dkt. 33 at 51–55.  Nor does he make any attempt to show when he requested those accommodations or if they were possible.  *See id.*  Accordingly, the court limits its analysis to the accommodations John focused on in his Opposition—his medical restrictions after the November 2017 injury and the ability to stand back.

[269] Dkt. 27 at 26–28.

[270] *John Depo.* at 179:18–22; *see also* Dkt. 2 ¶¶ 57–58; Dkt. 33 at 55.

[271] *Id.* at 151:5–23, 180:1–12.

[272] *Id.* at 151:24–152:9.  John testified this happened "through the end of that calendar year 2017," meaning these events are within the relevant timeframe.  *See id.* at 152:2–6.

[273] *Id.* at 152:10–16.

Further, the City's duty to provide reasonable accommodations included an "obligation to engage in an interactive process."[274]  Yet John testified about Harris's negative behavior when John was on light-duty work restrictions.  After his November 2017 injury, John met with Harris "every morning" to discuss light-duty work assignments for the day.[275]  John testified Harris made disparaging remarks at several of these meetings, including that light-duty assignments were "unacceptable, especially for someone on probation."[276]  John stated Harris would repeatedly ask, "Well what are we going to do with you today?"[277]  And John recalled that when he was released to regular duty in January 2018, Harris exclaimed, "What do you mean you've got your release [to] full duty but he recommended that?  This is ridiculous."[278]

This testimony shows a dispute of material fact about whether the City engaged in a good-faith interactive process.  The jury should evaluate this testimony and assign its proper weight.  And because the City argues it accommodated John, there is no dispute that reasonable accommodations were possible, meaning John is not basing his claim solely on the City's failure to engage in an interactive process.[279]

The City nevertheless argues John cannot rely on its alleged failure to accommodate him after the November 2017 injury because John alleges he "begged his doctor not to put him on light duty."[280]  But John never said he asked *the City* not to put him on light duty restrictions,

---

[274] *Smith*, 180 F.3d at 1172.

[275] *John Depo.* at 178:6–10.

[276] *Id.* at 180:19–181:10.

[277] *Id.* at 182:19–183:1.

[278] *Id.* at 183:12–184:19.

[279] *See Smith*, 180 F.3d at 1174 (stating a plaintiff who establishes a failure to engage in the interactive process is "not entitled to recovery unless he can also show that a reasonable accommodation was possible").

[280] Dkt. 41 at 15 (quoting Dkt. 33 at 15).

and there is no dispute that the City put him on light duty restrictions at that time.[281]  Moreover, John testified he informed Harris when tasks were outside his restrictions, but Harris "ordered" him to complete the tasks anyway.[282]  So the City's argument that John did not want accommodations does no more than show a dispute of material fact.

Second, there is genuine dispute of material fact about whether the City accommodated John by allowing him to stand back.  John argues that from 2016 to 2018, Rodriguez told him to "stand back" when he was in pain.[283]  John further argues the City failed to accommodate him because he was not actually allowed to stand back when necessary.[284]  The City asserts he was allowed to stand back.[285]

The City is correct that John testified he was allowed to stand back when he was in pain.[286]  But John also testified he was ultimately written up for standing back,[287] and his annual performance review includes comments that he "[a]llows others to 'carry the load'" and needs reminders "to put more effort on the assigned task."[288]  And Rodriguez could not "recall ever telling Mr. John that he could stand back if he was in pain."[289]  John's testimony that he was punished for standing back—coupled with Rodriguez's testimony—is sufficient to show a genuine dispute of material fact regarding whether John was allowed to stand back.

---

[281] Dkt. 27 ¶ 26 (stating the City "accommodated John with light-duty work" after the November 2017 injury); Dkt. 33 at 15 (stating "John was placed on light duty" after the November 2017 injury).

[282] *John Depo.* at 151:24–152:16.

[283] *Id.* at 44:2–23; Dkt. 33 at 54.

[284] Dkt. 33 at 54.

[285] Dkt. 27 at 27.

[286] *See John Depo.* at 130:15–131:8.

[287] *Id.*

[288] *2018 Performance Review* at 415.

[289] *Rodriguez Depo.* at 33:8–10.

For these reasons, the City is not entitled to summary judgment on John's claim that the City failed to provide reasonable accommodations so he could continue as a Paramedic/Firefighter.

### 3. There is not a genuine dispute of material fact concerning John's request for reassignment.

John also argues the City failed to accommodate him because it did not reassign him to his requested positions.[290] The City argues John has not shown he was qualified for any vacant positions.[291] On this, the court agrees with the City.

As an initial matter, it is uncertain whether the City was required to consider reassignment. This is because, as explained, reassignment is typically required only if the employee cannot continue in their current position with accommodations.[292] Here, John argues the City failed to accommodate him so he could continue as a Paramedic/Firefighter, so it is unclear whether he is also arguing he was ultimately unable to continue as a Paramedic/Firefighter even with accommodations and thus required reassignment.[293]

Regardless, the City is entitled to summary judgment because John has not established "he was qualified to perform an appropriate vacant job."[294] A position is "vacant" if it "would be available to similarly-situated nondisabled employees to apply for and obtain."[295] The court

---

[290] Dkt. 33 at 52–53.

[291] Dkt. 27 at 29.

[292] *See Smith*, 180 F.3d at 1170.

[293] *Compare* Dkt. 2 ¶ 75 ("At all times relevant hereto, Mr. John was qualified to perform the essential functions of his job and did in fact perform the essential functions of his job with Murray City with or without reasonable accommodation."), *with* Dkt. 33 at 8–9 ("John also stated that he could have done his essential jobs with accommodation, including, requesting a new position as a driver or engineer, or a job in the fire marshal's office[] and the ability to stand back." (quotation simplified)).

[294] *See Taylor*, 196 F.3d at 1110.

[295] *Duvall*, 607 F.3d at 1263.

37

addresses each of John's requested positions below and concludes he has not made the required showing.

John requested reassignment to the fire prevention office.[296]  He testified he "believe[d]" there were openings in that office,[297] but he could not remember the "job titles" that had openings.[298] He also explained that the openings were for "the people who go around and inspect buildings."[299]  These vague assertions are not sufficient.  As explained, John must establish "he was qualified to perform an appropriate vacant job."[300]  But he has not identified the "specific vacant position"[301] he could have been reassigned to.[302]  And although he testified there were open positions, he has not attempted to establish they were vacant[303]—i.e., that the positions were "available to similarly-situated nondisabled employees to apply for and obtain."[304]  Nor has he attempted to establish he was qualified for these positions.[305]  He has thus not met his burden of showing a vacant position in the fire prevention office he was qualified for.

John also requested reassignment to an engineer/driver/operator position.[306]  He testified there were openings for this position when he requested reassignment.[307]  But, as with the fire

---

[296] *John Depo.* at 76:6–11.

[297] *Id.* at 77:18–19.

[298] *Id.* at 77:23–78:1.

[299] *Id.* at 77:20–22.

[300] *Taylor*, 196 F.3d at 1110.

[301] *See Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013).

[302] *See* Dkt. 33 at 52–53.

[303] *See id.*

[304] *Duvall*, 607 F.3d at 1263; *see id.* at 1263–64 ("Even if those positions were 'open positions that [GP] had,' that does not answer whether the positions were vacant, such that other, nondisabled GP employees would have been able to apply for and obtain them.").

[305] *See* Dkt. 33 at 52–53.

[306] *John Depo.* at 76:6–11.  John testified he requested reassignment to "engineer, driver, operator," *id.*, but he later clarified all three are the same position, *see id.* at 36:11–16, 77:16–18.

[307] *Id.* at 77:8–15.

prevention position, John has not established that this position was vacant or that he was qualified for it.[308]  And even though he testified he worked as an engineer for another fire department and sometimes "filled in as an engineer" for the City,[309] he has not explained why that means he was qualified for the engineer position that was open.  Accordingly, John has not shown he was qualified for a vacant engineer/driver/operator position.

John also requested reassignment as a Firefighter EMT or EMT.[310]  John testified that Rodriguez told him there was a Firefighter EMT position "available" and John could have it if he went off light duty work.[311]  John stated he went off light duty after confirming with the City's Human Resources Director that the job "was in fact available."[312]  But John testified that when he went off light duty work, Harris told him, "there is no job for you" and "there never was a job position."[313]  John also testified that on another occasion, he asked Harris about the possibility of working as an EMT but never received an answer.[314]

Even assuming these facts as true, John has not established that a Firefighter EMT or EMT position was vacant and that he was qualified for it.  For example, John does not attempt to explain why an "available" position is the same as a "vacant" position,[315] nor does he argue that Harris was incorrect in saying "there never was a job position."  Indeed, he does not even mention this evidence in the section of his Opposition where he argues the City failed to reassign

---

[308] *See Duvall*, 607 F.3d at 1263.

[309] *John Depo.* at 37:3–16.

[310] Dkt. 33 at 39; Dkt. 2 ¶¶ 44–47; *John Depo.* at 114:8–116:22, 127:6–17.

[311] *John Depo.* at 114:8–16.

[312] *Id.* at 115:8–22.

[313] *Id.* at 116:13–18.

[314] *Id.* at 126:16–127:12.

[315] Although this may seem like a trivial distinction, the Tenth Circuit in *Duvall* concluded that an "open" position was not necessarily the same as a "vacant" position.  *Duvall*, 607 F.3d at 1263–64.  That same reasoning applies here—just because a position was "available" does not necessarily mean it was "available to similarly-situated nondisabled employees to apply for and obtain."  *See id.* at 1263.

him.[316]  John has thus not established he was qualified for a vacant Firefighter EMT or EMT position.

In sum, John has not established that he was qualified to perform a vacant position.  That is fatal to John's claim, even if the City failed to engage in an interactive process.[317]  For that reason, the City is entitled to summary judgment on John's claim that the City failed to accommodate him by not reassigning him.

## III.    Retaliation in Violation of the ADA (Third Cause of Action)

John claims the City disciplined and terminated him because he requested accommodations.[318]  The City is entitled to summary judgment on this claim because the undisputed facts cannot support a conclusion that John's requests for accommodation were the cause of his discipline or termination.

"To establish a prima facie case of retaliation, [John] must show that '(1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.'"[319]  The City concedes the first two elements but argues John cannot show causation.[320]  John responds by contending that he has shown causation because the City's justifications for the

---

[316] *See* Dkt. 33 at 52–53.

[317] *See Taylor*, 196 F.3d at 1110; *Duvall*, 607 F.3d at 1263.

[318] Dkt. 2 at 13–14; *see also* Dkt. 33 at 67–69.

[319] *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1183 (10th Cir. 2002) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001)).

[320] *See* Dkt. 41 at 27 (confirming the "focus should be on the third element of this claim").  In its Motion, the City argues John has not shown temporal proximity between his requests for accommodation and the adverse employment actions.  *See* Dkt. 27 at 37–38.  Temporal proximity is one way employees may show causation, *see Hysten*, 296 F.3d at 1183, but John does not argue causation based on temporal proximity, *see* Dkt. 33 at 67–69.  For that reason, the court does not discuss temporal proximity in this section.

adverse employment actions "are not supported by the record."[321]  The court disagrees with

John's contention, as explained below.

With respect to the City's disciplinary measures, John identifies only one specific

disciplinary measure: the August 2016 written reprimand for inadequate medical

documentation.[322]  John claims this disciplinary measure is without evidentiary support because

his "performance evaluations do not reflect that [he] ever had any such issues."[323]  But John's

supervisor testified he reprimanded John because a hospital nurse called to complain about

John's documentation.[324]  So there is evidentiary support for this disciplinary measure, and the

fact that his performance evaluations do not reflect problems with documentation is insufficient

to show a causal connection between John's requests for accommodations and the written

reprimand.

Beyond the August 2016 written reprimand, John vaguely asserts that the City "began to

'nitpick'" everything he did despite his positive scores and improvement.[325]  In John's monthly

probation reports, his supervisor indicated he was improving and meeting expectations from

January through May 2018.[326]  But John has not explained how those positive reports show a

causal connection between John's protected activity and a disciplinary measure.  This is

especially true because the June 2018 report indicated John needed to improve in safety,

following instructions, and fire skills.[327]

---

[321] Dkt. 33 at 67.

[322] *See id.*

[323] *Id.* at 67–68.

[324] *Dykman Depo.* at 21:4–24:11.

[325] Dkt. 33 at 68 (quoting *John Depo.* at 304:8–12).

[326] *See 2017-18 Probation Reports* at 396–401.

[327] *See id.* at 404–05.

John's arguments concerning his termination are similarly lacking.  He asserts the City

used "performance problems" as a "pretext" for his termination because his probationary reports

showed he was meeting expectations.[328]  When an employee argues that an employer's

justification is pretext, the employee "must present 'evidence of such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons.'"[329]  Moreover, the employee "must come forward with evidence that the employer

didn't really believe its proffered reasons for action and thus may have been pursuing a hidden

discriminatory agenda."[330]

John has not made the necessary showing because although the reports indicated he was

meeting expectations and improving from January to May 2018, the June 2018 report indicated

John needed to improve in several areas.[331]  Moreover, in the Termination Letter, Harris

indicated several concerns the City had with John's behavior, including his positive drug test, his

probation extension, the Fire Incident, and the Needle Stick Incident.[332]  Harris also stated the

City was viewing his behavior "in the context of an employee who is on *extended* disciplinary

probation."[333]  And he acknowledged John's positive reports, but described this as part of "a

---

[328] Dkt. 33 at 68.  Typically, courts consider pretext during the third step of a *McDonnell Douglas* inquiry.  *See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (explaining the *McDonnell Douglas* burden-shifting framework and that at the third step, the employee must show pretext).  Nevertheless, the Tenth Circuit has "considered evidence of pretext in the prima facie stage of a retaliation claim." *Id.* at 1209.  For that reason, the court will consider John's arguments to be about his prima facie burden.

[329] *Proctor*, 502 F.3d at 1209 (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)).

[330] *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287 (10th Cir. 2022) (quoting *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)).

[331] *2017-18 Probation Reports* at 404–05.

[332] *Termination Letter* at 462–64.

[333] *Id.* at 463.

repeated pattern of meeting expectations for a few months followed by inappropriate behaviors

and lapses of judgment."[334]   Accordingly, John has not presented evidence that the City's

proffered reasons are so inconsistent or contradictory that "a reasonable factfinder could

rationally find them unworthy of credence."[335]   And although John disputes the City's view of

some events—like the Fire Incident—he has not presented evidence that the City "didn't really

believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory

agenda."[336]

        In short, the fact that John received some positive reports cannot establish that John's

requests for accommodation were the cause of the City's disciplinary measures or termination

decision.  The City is thus entitled to summary judgment on this claim.

## IV.   Wrongful Termination in Violation of the Utah Workers' Compensation Act (Fifth Cause of Action)

        John claims the City violated the Utah Workers' Compensation Act because it terminated

him for "exercising his right to workers' compensation benefits."[337]   Summary judgment is

appropriate because the undisputed evidence cannot show John's protected activity was a

substantial factor in the City's termination decision.

        "To make out a prima facie case of wrongful discharge [under Utah law], an employee

must show (i) that his employer terminated him; (ii) that a clear and substantial public policy

existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge

---

[334] *Id.* at 464.

[335] *See Proctor*, 502 F.3d at 1209 (quoting *Argo*, 452 F.3d at 1203).

[336] *Litzsinger*, 25 F.4th at 1287 (quoting *Johnson*, 594 F.3d at 1211).

[337] Dkt. 2 ¶ 109.

and the conduct bringing the policy into play are causally connected," that is, "the conduct bringing the public policy into play was *a* cause of the firing."[338]

If the employee makes a prima facie case, the employer must "articulate a legitimate reason" for the termination.[339]  The employee must then show the protected activity "was a 'substantial factor' in the employer's motivation to discharge the employee."[340]  Accordingly, the employee "may prevail on an unlawful termination claim if the employer fired the employee for multiple reasons, including the employee's engagement in protected activity—but not where the protected activity, although perhaps *a* reason for termination, did not ultimately play an important role in the employer's decision to fire the employee."[341]

The City argues John has not made a prima facie showing because he cannot satisfy the fourth element—causation.[342]  It contends he cannot show causation because of the temporal disconnect between his workers' compensation claims and his termination.[343]  But it also argues that even if John has made a prima facie showing, it has articulated a legitimate reason for his termination—specifically, the probation reports indicating he needed to improve, his "does not meet expectations" annual performance review, and the Fire Incident.[344]  The City then argues John has failed to show his protected activity was a "substantial factor" in the City's decision.[345]

---

[338] *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998) (internal quotation marks and footnotes omitted).

[339] *Id.* at 405.

[340] *Id.*

[341] *Medina v. Jeff Dumas Concrete Constr. LLC*, 2020 UT App 166, ¶ 19, 479 P.3d 1116.

[342] Dkt. 27 at 40–42.

[343] *Id.*

[344] *Id.* at 43.

[345] *Id.* at 42–44.

John does not address his prima facie burden.[346]  Rather, he starts by arguing his workers' compensation claims were a "substantial factor" in his termination.[347]  By jumping to this final step, John appears to concede the City has articulated a legitimate reason for his termination.[348]  Even assuming he met his initial burden, he has presented insufficient evidence to satisfy the substantial factor test.

A temporal disconnect between an employee's protected activity and termination makes it difficult to show causation.  In *Gordon v. Home Depot U.S.A., Inc.*, for example, the court concluded an employee failed to make a prima facie showing of wrongful termination.[349]  This conclusion was based in part on temporal disconnect: the employee was injured in December 2009 and reported a second injury in April 2011, but was not terminated until October 2011.[350]

John filed workers' compensation claims in December 2007, April 2016, October 2016, November 2017, and June 2018.[351]  He was terminated in September 2018.[352]  The closest temporal connection is with the June 2018 claim.  But the June 2018 claim was for the Needle Stick Incident, and John does not mention the June 2018 claim in his argument.[353]  John also does not mention this claim in his Statement of Facts when he recites his history of workers' compensation claims.[354]  Accordingly, John has not argued the City terminated him because of

---

[346] *See* Dkt. 33 at 69–72.

[347] *See id.*

[348] *See id.*

[349] 191 F. Supp. 3d 1271, 1280–82 (D. Utah 2016).

[350] *Id.* at 1281.

[351] Dkt. 27 ¶ 4.

[352] Dkt. 33 ¶ 40.

[353] *See* Dkt. 33 at 70–72.

[354] *Id.* at 37–41.  John describes the Needle Stick Incident and the discipline he received.  *See id.* at 44.  But he does not list the related workers' compensation claim or argue he was disciplined because he filed a claim.  *See id.* at 37–41, 66–68.  Rather, his point seems to be that he was treated differently than other employees.  *See id.*

the June 2018 claim.  Disregarding the June 2018 claim, the November 2017 claim is next closest in time to John's termination.  But he filed that claim at least eight months before his termination.  Eight months is a sizable temporal disconnect to overcome.

John nevertheless argues he can succeed under *Medina v. Jeff Dumas Concrete Construction LLC*.[355]  In that case, an employee filed a workers' compensation claim and was terminated four months later.[356]  The Utah Court of Appeals held summary judgment was not appropriate because the employee presented "sufficient circumstantial evidence" to show his protected activity was a "substantial factor" in his termination.[357]  Specifically, the employee presented evidence that his supervisors told him "[g]et off the job site" when he reported his injury and later accused him of fabricating the incident that caused the injury.[358]  He also presented evidence that his employer terminated him via text while he was giving deposition testimony for his workers' compensation claim.[359]  This circumstantial evidence was enough to satisfy the substantial factor test, even though there was some "temporal disconnect" between when the employee filed his claims and when he was terminated.[360]

John argues he presented circumstantial evidence sufficient to span any temporal disconnect between when he filed his claims and when he was terminated.[361]  But that circumstantial evidence is just an explanation of his claim history coupled with dates he was disciplined.  Unlike the employee in *Medina*, the evidence John points to cannot support an

---

[355] 2020 UT App 166.

[356] *Id.* ¶ 30.

[357] *Id.* ¶ 31.

[358] *Id.* ¶¶ 24–25.

[359] *Id.* ¶ 26.

[360] *Id.* ¶ 30.

[361] Dkt. 33 at 69–72.

inference that his claims were a substantial factor in the City's decision to terminate him.[362]  For example, John explains he filed a workers' compensation claim in April 2016 and was reprimanded in August 2016 for inadequate medical documentation.[363]  But these events are four months apart, and John does not explain how they are connected.[364]  Moreover, John's supervisor testified John was reprimanded because a hospital employee complained about John's documentation.[365]  The supervisor also testified this was the first time he had received a complaint from a hospital about any employee.[366]

John also states his probation was extended for another year the same day he appealed from a workers' compensation decision.[367]  He further explains the appeal was settled in April 2018 and he was informed about several complaints against him in August 2018.[368]  But John does not present evidence that his supervisors were aware of his appeal.[369]  If they were not aware of his appeal, then it could not have been a substantial factor in their termination decision.

John also points to Harris's negative behavior while John was on light-duty work restriction.[370]  He argues Harris's behavior is attributable to John's workers' compensation claims, which John testified cost approximately $122,000 in 2018.[371]  Harris's comments may suggest animosity towards John.  But John was on light-duty work restriction in January 2018, at least eight months before he was terminated.  Eight months is a considerable temporal

---

[362] *See* 2020 UT App 166, ¶ 30.

[363] Dkt. 33 at 71; *see also John Depo.* at 217:2–11.

[364] *See* Dkt. 33 at 71.

[365] *Dykman Depo.* at 21:4–24:11.

[366] *Id.* at 76:14–19.

[367] Dkt. 33 at 71.

[368] *Id.*

[369] *See generally id.* at 71–72.

[370] *Id.* at 72.

[371] *Id.*

disconnect, and John has not presented circumstantial evidence to connect Harris's comments to his later termination.  Moreover, there is no evidence that Harris or John's other supervisors knew how much John was receiving in workers' compensation.[372]

Finally, John argues the City was "nitpicking" him on "everything" because he filed workers' compensation claims.[373]  The employee in *Gordon* made a similar argument, asserting "the negative performance evaluations and discipline he received after his injuries evidence[d] a pattern of hostility."[374]  But the court rejected that argument because the employee's assertion was "unsupported by the record" and there was no evidence that other employees would have been treated differently.[375]

Similarly, John's assertion that he was disciplined because of his compensation claims is unsupported by the record.  For example, John challenges the City's decision to reprimand him for inadequate medical documentation, but the City provided evidence a hospital employee complained about his documentation.[376]  And John's probation was extended in October 2017 in part because John did not pass the national paramedic test.[377]  John's only challenge is that he remembers passing the test.[378]  Like the employee in *Gordon*, John's description of the relevant disciplinary measures is not supported by the record.

John also has not shown other employees would have been treated differently for similar conduct.  For example, John's supervisor testified John was the only Paramedic/Firefighter he

---

[372] *See id.*

[373] *Id.*

[374] 191 F. Supp. 3d at 1281.

[375] *Id.*

[376] *Dykman Depo.* at 21:4–24:11.

[377] *Third Probation Letter* at 388.

[378] Dkt. 33 at 23.

had given a written reprimand for inadequate medical documentation.[379]  But he also testified the only time he received a complaint directly from a hospital was when a hospital employee called about John's inadequate documentation.[380]

     In sum, even assuming John could make a prima facie case of wrongful termination, the City has articulated a legitimate reason for his termination, and the evidence John relies on cannot show his protected activity was a "substantial factor" in his termination.  The City is thus entitled to summary judgment on this claim.

## CONCLUSION

     For the reasons stated, the City's Motion for Summary Judgment[381] is GRANTED IN PART and DENIED IN PART.  The court GRANTS summary judgment in the City's favor on John's first, third, fourth, and fifth claims.  With respect to John's second claim:

- The court GRANTS summary judgment in the City's favor insofar as this claim relies on the ADA.

- The court GRANTS summary judgment in the City's favor insofar as this claim relies on the Rehabilitation Act and John's argument that he should have been reassigned.

- The court DENIES summary judgment insofar as this claim relies on the Rehabilitation Act and John's argument that the City failed to accommodate him so he could continue working as a Paramedic/Firefighter.

     SO ORDERED this 28th day of March 2023.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge

---

[379] *Dykman Depo.* at 26:23–25.

[380] *Id.* at 76:14–19.

[381] Dkt. 27.